IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 21-cv-03133-GPG

JARED TRENTON COWEN,

      Plaintiff-Appellee,

v.

WD EQUIPMENT, LLC, and
AARON WILLIAMS,

      Defendants-Appellants,

and

THE ESTATE OF BERT DRING,

      Defendant.

---

## ORDER

---

Defendants-Appellants WD Equipment, LLC (WD) and Aaron Williams (Mr. Williams, and collectively with WD, Appellants) timely appealed a final order of the United States Bankruptcy Court for the District of Colorado. In this order, the bankruptcy court found and concluded that Mr. Williams and Bert Dring (Mr. Dring, and collectively with Appellants, Defendants) had violated the automatic stay imposed by 11 U.S.C. § 362 and awarded Plaintiff-Appellee Jared Cowen (Mr. Cowen, or Plaintiff) actual and punitive damages pursuant to subsection (k)(1) of that statute. Appellants and Plaintiff both filed opening briefs (D. 12; D. 13).

Appellants elected not to file a reply brief within the applicable deadline (*see* D. 14).  For the reasons stated below, the judgment of the bankruptcy court is AFFIRMED.

## I.  JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 158(a)(1), which permits "[t]he district courts of the United States . . . to hear appeals from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of [Title 28]."

## II.  STANDARD OF REVIEW

This Court reviews the bankruptcy court's findings of fact under a clear-error standard. *See WD Equip., LLC v. Cowen (In re Cowen)*, 849 F.3d 943, 947 (10th Cir. 2017).  This means that the Court is bound by the bankruptcy court's factual findings unless they are "without factual support in the record or if, after reviewing all of the evidence [the Court is] left with the definite and firm conviction that a mistake has been made."  *Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1153 (10th Cir. 2007) (quotation omitted).  The Court reviews the bankruptcy court's legal determinations *de novo*.  *First Bank v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987).  "To the extent the bankruptcy court's determination presents mixed questions of law and fact, [the Court's] review depends on the primary nature of the question presented—[the Court] review[s] legal determinations *de novo*; [it] defer[s] to the bankruptcy court's factual determinations."  *Mosher v. Herrell (In re Mosher)*, 833 F. App'x 201, 202 (10th Cir. 2020) (citing *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)).  Of particular relevance to this case, whether a bankruptcy court's procedures comport with due process is an issue the district court reviews *de novo*.  *State Bank of S. Utah v. Gledhill (In re*

*Gledhill)*, 76 F.3d 1070, 1083 (10th Cir. 1996). But a bankruptcy court's decision to open (or decline to re-open) the evidentiary record on remand is typically reviewed for abuse of discretion. *See N.D. v. Bala (In re Racing Servs.*, *Inc.),* 635 B.R. 498, 506 (B.A.P. 8th Cir. 2022) ("[T]he determination of whether to reopen the record on remand is committed to the trial court's discretion.").

## III.  BACKGROUND

Plaintiff is a truck driver (D. 6-2 at 230). He filed for Chapter 13 bankruptcy on August 6, 2013 (*id.*). Before his bankruptcy filing, Plaintiff owned two semi-trucks—a 2000 Peterbilt and a 2006 Kenworth (*id.* at 232). Unfortunately for Plaintiff, his Peterbilt experienced a series of mechanical failures (*id.*). WD—which operates a used car lot—loaned Plaintiff funds for repairs, secured by a lien on the Peterbilt (*id.*). Shortly after the WD-financed repairs were completed, the Peterbilt broke down again (*id.*). The repair company estimated that additional repairs would cost around $9,000 and refused to perform further work without payment upfront (*id.* at 233).

Unable to afford the latest round of repairs, and unable to use his Peterbilt, Plaintiff defaulted on WD's loan (*id.*). In early August 2013, he attempted to refinance, meeting with his bank and contacting Mr. Williams—WD's principal—to request payoff quotes (*id.*). On August 1 and 2, 2013, Mr. Williams offered Plaintiff conflicting information on potential payoff options, and repeatedly accelerated Plaintiff's payoff deadline, ultimately demanding that Plaintiff pay off the WD loan on August 6, 2013 (*id.*). Without Plaintiff's knowledge, Mr. Williams also re-titled the Peterbilt on August 1, 2013, and directed the repair shop to stop communicating with Plaintiff about the Peterbilt (*id.*).

Around the same time that he defaulted on the WD repair loan, Plaintiff defaulted on a purchase-money loan for his Kenworth (*id.*).  Mr. Dring—Mr. Williams' stepfather—had financed Plaintiff's purchase of the Kenworth, extending a $20,900 loan secured by the truck (*id.*).  On July 29, 2013, Mr. Dring lured Plaintiff to the WD yard on the pretense of showing one of Plaintiff's trailers to a prospective buyer (*id.*).  When Plaintiff and his son (who was only 12 or 13 years old at the time) arrived at the WD yard in the Kenworth with the trailer in tow, Mr. Dring declared the Kenworth "repossessed" (*id.*)  The parties dispute Mr. Dring's exact actions during the repossession, but Plaintiff and his son testified that Mr. Dring and a band of Mr. Dring's friends encircled them, and that Mr. Dring threatened Plaintiff with mace (*id.* at 234).  In the face of Mr. Dring's threats, Plaintiff and his son left the yard on foot (*id.*).  Three days later, Plaintiff received a letter (purporting to be from Mr. Dring) offering him ten days to pay off the Kenworth (*id.*).

After losing possession of his two trucks, Plaintiff filed for bankruptcy protection, beginning what United States Bankruptcy Court Judge Elizabeth Brown has aptly described as this case's "long and tortured history" (*id.* at 230).  Plaintiff filed his August 6, 2023, bankruptcy petition within the 10-day cure period for the Kenworth, and on the day that Mr. Williams had set as the payoff deadline for the repair loan on the Peterbilt.  Through counsel, he notified Defendants of his bankruptcy petition and demanded that they immediately return his trucks (*id.* at 235).  Defendants did not comply (*id.*).  On Plaintiff's motion, the bankruptcy court entered a turnover order directing Defendants to return the trucks and warning Defendants that "[c]ontinuing failure to turn over the Truck[s]" could "result in the imposition of monetary damages . . . for willful violation of the automatic stay" (D. 6-1 at 850).  When Defendants still did not turn the trucks over, Plaintiff filed an adversary proceeding against Defendants (D. 6-2 at 235).  But without the

trucks, Plaintiff lacked regular income and was unable to comply with his Chapter 13 plan (*id.* at 242).   Accordingly, the bankruptcy court dismissed Plaintiff's underlying bankruptcy case (*id.*). Despite dismissing Plaintiff's bankruptcy case, the bankruptcy court expressly retained jurisdiction over the related adversary proceeding, which went to trial in 2014 (*id.*).

Based on evidence adduced at the 2014 trial, the bankruptcy court found that Defendants had violated the automatic stay by failing to turn the trucks over to Plaintiff post-petition (D. 6-1 at 246).   The bankruptcy court also found that Defendants had engaged in serious misconduct during the trial, including by presenting a fabricated bill of sale for the Kenworth and coaching sequestered witnesses (*id.* at 252).   Defendants appealed to the United States District Court for the District of Colorado, which, in an order authored by United States District Judge Robert E. Blackburn, reversed on a damages-calculation issue, but otherwise affirmed the bankruptcy court's order.   *See generally Cowen v. WD Equipment, LLC (In re Cowen)*, 549 B.R. 774 (D. Colo. 2015). In affirming the bankruptcy court's decision, the District Court—as the bankruptcy court had— applied a then-majority rule, under which a creditor's mere retention of collateral post-bankruptcy violated the automatic bankruptcy stay.   *Id.* at 783.

Defendants then appealed the District Court's decision to the Tenth Circuit.   In a 2017 opinion, the Tenth Circuit reversed and adopted the minority rule, under which a creditor must engage in affirmative conduct (e.g., selling a vehicle) post-bankruptcy petition to violate the automatic bankruptcy stay.   *In re Cowen*, 849 F.3d at 950.   On remand, Appellants advised the bankruptcy court that Mr. Dring had passed away on or about April 27, 2016 (D. 6-2 at 21). Plaintiff ultimately substituted Mr. Dring's estate for Mr. Dring (D. 6-2 at 74), but Mr. Dring's estate has not participated in any of the bankruptcy court proceedings and is not a party to the

instant appeal.  Shortly after this case returned to the bankruptcy court on remand, the bankruptcy

court set a status conference, and informed the parties that it was evaluating reopening the

evidentiary record:

> This Court's prior order and judgment found that the Defendants
> violated the automatic stay by failing to return the Plaintiff's
> commercial trucks.  The Tenth Circuit reversed this holding, based
> on an argument that was not raised at trial, and adopted a minority
> position concerning the scope of the automatic stay that had not
> previously been followed by the courts in this circuit.  As such, on
> remand, this Court must consider the evidence presented in a new
> light and the parties may wish to supplement the evidence to address
> the new legal posture of this case. . . .
>
> Counsel should be prepared to argue whether the Court needs to
> reopen evidence to adequately address these issues.

(D. 6-2 at 75).

Following the status conference, the bankruptcy court set a two-day trial for May 2019 (*id.*

at 84).  But Appellants filed a Motion to Limit Issues Heard at Trial, objecting to the bankruptcy

court "reopening the record and the consideration of new evidence, because final judgment has

already entered" and contending that certain potential claims relating to sanctions under 11 U.S.C.

§ 542 had not been pleaded or tried (*id.* at 91–94).  The bankruptcy court set this motion for a

hearing (*id.* at 102).  In its order, the bankruptcy court noted that reopening the record was an issue

committed to the discretion of the bankruptcy court, and, after observing that potential notice

defects could be cured by amended pleadings, directed the parties to address the need for

amendments (*id.* at 102–103).  It also flagged that questions of damages apportionment were in

issue:

> At the first trial, all of the defendants, including Mr. Dring, were
> represented by one attorney and that attorney did not present any
> arguments that damages should be apportioned between the

6

> Defendants.  That is no longer the case.  Defendants WD Equipment
> and Aaron Williams now have different counsel and argue that they
> should not be liable for any damages caused by Mr. Dring.
> Assuming the Court ultimately apportions damages between the
> Defendants, Mr. Dring's probate estate may be the responsible party
> for some portion of those damages.  At the last status conference,
> the Court encouraged Debtor's counsel to investigate the status of
> Bert Dring's probate estate.  At the hearing, Debtor should be
> prepared to address whether Mr. Dring's probate estate is still open
> and whether the Debtor has the ability to assert and/or collect a claim
> against Mr. Dring's probate estate.

(*Id.* at 103).

Ultimately, the bankruptcy court vacated the trial setting and directed Plaintiff to file an amended complaint, perhaps in response to the positions that Appellants had taken in their Motion to Limit Issues Heard at Trial (*id.* at 104).  Because the bankruptcy court vacated the trial setting, it denied Appellants' motion as moot (*id.*).

Pursuant to the bankruptcy court's order, Plaintiff amended his pleadings.  Plaintiff's amended complaint asserted eight claims, which the Court summarizes as follows:

1.  **Count 1: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3).**  The gravamen of this claim was that Defendants violated the automatic stay order by perpetrating a fraud on the bankruptcy court during the 2014 trial.

2.  **Count 2: violation of the bankruptcy court's turnover order pursuant to 11 US.C. § 542 and violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3).**  Plaintiff claimed that Defendants violated the bankruptcy court's turnover order by refusing to turn over the Kenworth; this count also includes allegations that "Defendants' post-filing sale of the [Kenworth] divested the estate of the [Kenworth] and in doing so violated the Automatic Stay Order."

3.  **Count 3: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5) by transferring collateral post-petition.**  This claim is similar to Plaintiff's second claim.  Plaintiff alleged that "Defendants' transferring title of the [Kenworth] to Mr. Dring's name on August 7, 2013 was a post-petition act to deprive the bankruptcy estate of the [Kenworth] and therefore was a violation of the Automatic Stay Order intended to deprive the bankruptcy estate of an asset."

4. **Count 4: violation of the bankruptcy court's turnover order pursuant to 11 U.S.C. § 542 and violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5).**  Plaintiff's fourth claim concerned Defendants' failure to turn the Peterbilt over to him after the bankruptcy court issued a turnover order; it also contended that Defendants' violation of the bankruptcy court's turnover order independently violated the automatic stay.

5. **Count 5: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5).**  Plaintiff's fifth claim asserted that Defendants violated the automatic stay by failing to release the Peterbilt to Plaintiff and by directing the repair facility not to communicate with Plaintiff about the Peterbilt.

6. **Count 6: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5).**  Plaintiff contended that Defendants violated the automatic stay order by refusing to return personal property located in the vehicles.

7. **Count 7: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5) and sanctions pursuant to 11 U.S.C. § 105.**  This claim contended that Defendants' trial conduct constituted a stay violation and sought sanctions.

8. **Count 8: violation of the automatic stay order pursuant to 11 U.S.C. § 362(a)(3)–(5) and sanctions pursuant to 11 U.S.C. § 105.**  Plaintiff alleged that "Mr. Williams' transfer of the Kenworth's title[] the day after Plaintiff filed for bankruptcy was a violation of the Stay Order."

(*Id.* at 112-22).

After Plaintiff filed his amended complaint (and Appellants filed an amended answer), the United States Supreme Court granted certiorari in a case addressing the same issue underlying the Tenth Circuit's remand order: whether a creditor violates the automatic stay by merely retaining collateral post-petition. *See City of Chicago v. Fulton*, 140 S. Ct. 680 (2019); *see also In re Fulton*, 926 F.3d 916, 920 (7th Cir. 2019)*, vacated and remanded sub nom. City of Chicago v. Fulton*, 141 S. Ct. 585 (2021).  The parties agreed to hold further bankruptcy proceedings in abeyance until the Supreme Court rendered a decision (D. 6-2 at 190).  The Supreme Court (just as the Tenth Circuit had) held that the minority interpretation of § 362(a)(3) was correct, and that only affirmative conduct may violate the automatic stay.  *Fulton*, 141 S. Ct. at 592.

With the relevant legal standards for establishing a stay violation clarified, the bankruptcy proceedings resumed. On February 3, 2021, the bankruptcy court held a status conference to discuss the impact of the *Fulton* decision on its proceedings (D. 6-2 at 191, 194). At the status conference, the bankruptcy court (discussing *Fulton*) noted:

> Well, [] maybe we just let this case stand on the evidence that's already been submitted. We had a full trial. Everybody had a full opportunity to present their evidence, and we just now—if you want to, you make additional written closing arguments, given that you understand I'd be applying the lens of [11 U.S.C. §] 542 to this action, as opposed to—well, I would probably also be doing [11 U.S.C. §] 362(k).
>
> I'll be candid with you, because it wasn't simply that they merely retained possession post-Petition. They sold a car, or a truck, and they titled another truck in their name, and I know they claim they did that pre-Petition, but I didn't find that credible.
>
> So there was more that would also go under 362(k). So I'll be looking at it through both lenses.

(D. 6-3 at 4). The bankruptcy court then invited the input of the parties. Plaintiff's counsel agreed that a trial was unnecessary:

> We've kind of come to a similar conclusion on our end. A lot of the facts that we think the Court would need to make those decisions have already been before the Court, and the Court has already made decisions on them.

(*Id.*). Appellants' counsel represented that they had concerns about the fairness of holding a second trial, but also that they felt at least one of Plaintiff's theories had not been adequately litigated:

> You know, I have serious concerns about the viability of a trial this far after the fact. Mr. Dring is dead. Mr. Williams has been in a very serious car accident that resulted in him having multiple surgeries and memory loss. Some of the key witnesses are long

> gone, with whereabouts unknown.  And so, I have serious concerns about the ability to conduct a meaningful trial.
>
> However, I also have concerns about, you know, a 542 analysis.  I don't think that was pled in the complaint, and I don't know that a trial actually took place related to 542, although I guess, you know—well, there may be arguments about that, or not, but it certainly wasn't pled.
>
> And also as far as 362(k) goes, I don't—well, I don't think that there is any—the Court may have not found credible certain statements by the Defendants, but I don't think that will support a finding under 362(k).  You know, I don't really know, you know, the right way to proceed here.  I mean, I would take the stance that, as I'm sure the Court has heard from me before, that the award was based—for the Plaintiff was based on one thing and one thing only: The failure to turn over property.
>
> And it is clear from the Tenth Circuit in our case and *Fulton* that that would not support the award of damages, actual or punitive.
>
> And so, you know, I ask that the Court dismiss this.  The one thing that the award was based on is no longer viable, even though it was under Tenth Circuit [] law at the time.  And so that is where Defendant comes down.

(*Id.* at 6–7).  After registering the parties' positions, the bankruptcy court informed the parties that it would "give both sides an opportunity for an additional written closing" in lieu of a new trial (*id.* at 7).  The bankruptcy court asked the parties if they were opposed (*id.*).  Counsel for Appellants did not object to this plan in principle but asked that the bankruptcy court set a staggered briefing schedule rather than direct the parties to file simultaneous closing arguments (*id.* at 7–8).  The bankruptcy court granted this request (*id.* at 8).

In their closing argument, Appellants re-urged some of the arguments they asserted at the February 3, 2021, status conference:

> Preliminarily, the only causes of action litigated by the parties to this Adversary Proceeding were the claims for relief contained in the

> Debtor's Complaint to Determine Willful Violation of the
> Automatic Stay Order and for Return of Collateral and/or Damages
> (the "Complaint") (Adv. Dkt. 1), filed October 16, 2013.  The first
> three claims for relief in the Complaint allege a violation of the
> automatic stay due to the sale of a 2006 Kenworth semi-truck tractor
> (the "Kenworth") by Defendant Bert Dring ("Dring") after the
> Petition Date.  The fourth claim for relief alleges that a transfer of
> the title of the Peterbilt took place after the Petition Date,
> constituting a violation of the automatic stay, despite the fifth claim
> for relief specifically alleging that the title of the Peterbilt was
> transferred on August 1, 2013, prior to the Petition Date. The fifth
> claim for relief alleges that Defendants' withholding of the Peterbilt
> after the Petition Date constitutes a violation of the automatic stay.
> (Adv. Dkt. 1)  In addition to the five claims for relief in the
> Complaint, this Court found that the parties had tried by consent an
> additional claim that the Defendants' failure to return certain
> personal property to the Debtor also constituted a violation of the
> automatic stay.  (Adv. Dkt. 50)  No other issues were litigated in the
> Adversary Proceeding.
>
> Debtor now asserts eight theories under which the Defendants may
> be liable.  Defendants will address each of those eight theories in the
> order presented by Debtor, however, Defendants object to any
> findings or orders of this Court for claims or causes of action that
> were not pled and fully litigated. . . .

(D. 6-2 at 217).

Appellants further argued that Plaintiff failed to differentiate among the Defendants in his

pleadings, did not specifically identify what conduct each individual Defendant engaged in, and

pleaded no theory permitting the conduct of one defendant to be imputed to another:

> Defendants also object to Debtor's lack of specificity regarding
> which specific defendants performed which actions.  Debtor did not
> plead conspiracy or any other claim for relief that could support the
> liability of one defendant for the actions of another.  Defendants
> further object to the statements of fact contained in Debtor's Closing
> Argument, filed March 3,2021, that do not cite to the record, as well
> as the Court's consideration of any evidence or alleged evidence that
> was not adduced at trial.  Each of these objections is predicated on
> Defendants' constitutional due process rights to notice and a full and
> fair opportunity to be heard, as well as the right to confront and

11

cross-examine the witnesses against them.  *Int'l Union v. Bagwell*, 512 U.S. 821, 832 (1994) (citing *Taylor v. Hayes*, 418 U.S. 488 (1974).

(*Id.* at 217–18).

Appellants' closing argument also incorporated arguments raised in earlier briefing, including those raised in their Motion to Limit Issues Heard at trial:

> Defendants incorporate by reference, as if fully transcribed herein, all objections and arguments contained in Defendants' Brief Regarding Sanctions (Adv. Dkt. 127), Defendants' Reply Brief Regarding Sanctions (Adv. Dkt. 128), and Defendants' Motion to Limit Issues Heard at Trial (Adv. Dkt. 121).

(*Id.* at 218).

Based on the parties' written submissions and the evidence adduced during the 2014 trial, the bankruptcy court entered judgment in Plaintiff's favor for a second time.  It concluded that Mr. Dring—with Mr. Williams' assistance—violated 11 U.S.C. § 362(a)(3) (a Bankruptcy Code provision staying "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate") and 11 U.S.C. § 362(a)(4) (which stays "any act to create, perfect, or enforce any lien against property of the [bankruptcy] estate") by transferring title to the Kenworth post-petition (*see id.* at 242).  For these stay violations, the bankruptcy court awarded $253,038.28 in actual and punitive damages pursuant to 11 U.S.C. § 362(k)(1) (which provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages . . . and, in appropriate circumstances, may recover punitive damages") (*id.* at 252).

The bankruptcy court determined that Mr. Williams was jointly and severally liable for this amount:

> The Court concludes that Mr. Williams and Mr. Dring are jointly and severally liable . . . .  Although Mr. Dring was ultimately responsible for selling the Kenworth, Mr. Williams knowingly assisted Mr. Dring in preparing and submitting the title paperwork to achieve this violation of the automatic stay.  In so doing, Mr. [Williams] acted as Mr. Dring's agent in changing title to the Truck. Normal principles of agency law apply in determining liability under § 362(k). . . .  Thus, where a creditor uses an agent to collect a debt in violation of the automatic stay, both the creditor and the agent can be held jointly and severally liable for their violations of the automatic stay . . . .

(*Id.* at 250).

When imposing punitive damages, the bankruptcy court applied the factors enumerated in *Diviney v. NationsBank of Texas, N.A. (In re Diviney)*, 225 B.R. 762, 776 (B.A.P. 10th Cir. 1998) and *In re Gagliardi*, 290 B.R. 808, 820 (Bankr. D. Colo. 2003):

> The Court finds that an award of punitive damages equal to the amount of the actual damages is warranted in this case.  Although the Court received no evidence regarding any of the Defendants' ability to pay damages, the remaining factors weigh heavily in favor of the imposition of punitive damages here.  Mr. Dring's and Mr. Williams' conduct involves the most egregious stay violations the Court has ever seen.  While the Debtor clearly defaulted on his loan obligations, nothing he did justified the scorched earth tactics employed by the Defendants.  The Court found that Mr. Dring's and Mr. Williams' attitudes while testifying to be contemptuous of the bankruptcy process, the Debtor, and the Court.  And while Mr. Dring and Mr. Williams may not be sophisticated in the sense of running a Fortune 500 company, they are extremely scheming and manipulative.
>
> In their attempts to avoid liability for their actions, Mr. Dring and Mr. Williams likely forged documents and gave perjured testimony. Certainly, they changed their stories over the course of this case on both major and insignificant issues.  The documents they produced to attempt to convince the Court that the Debtor's rights in the Kenworth had been terminated pre-bankruptcy were highly suspect to say the least.  And it came to light during the trial that they coached their witnesses on what to testify to during the breaks, despite a sequestration order to the contrary. . . .

> In assessing the amount of punitive damages, the Court weighs heavily the need to send a message to deter any other creditor from following the actions of these Defendants. . . .  If creditors are able to forge documents in order to claim that a pre-petition transfer occurred to terminate a debtor's rights without facing substantial liability for doing so, then the automatic stay will become a nullity and bankruptcy will no longer provide relief to debtors.  This case demands the imposition of substantial sanctions.

(*Id.* at 251–52).

Notably, the bankruptcy court did not invoke 11 U.S.C. § 542 (which governs creditors' turnover obligations) as a basis for its damages award.  The bankruptcy court also concluded that Plaintiff lacked sufficient evidence to establish that Defendants violated the automatic stay by re-titling or otherwise disposing of the Peterbilt post-petition; the evidence adduced at the 2014 trial indicated that Defendants re-titled the Peterbilt pre-petition, an act that cannot constitute a stay violation under *Fulton* (*id.* at 240).  The bankruptcy court similarly found that Plaintiff had failed to establish a stay violation with respect to his personal property because he did not identify any relevant post-petition acts (*id.* at 242).

Appellants then filed the instant appeal, requesting that this Court review the following issues:

1. Whether the trial court denied Appellants due process with regard to theories of liability that were not adequately pleaded or tried?[1]

2. Whether the trial court made findings that were unsupported by the evidence adduced at trial and relied on those findings in issuing the final order and judgment?

---

[1] The Court presents Appellants' issues in a slightly different sequence than Appellants did.  If the Court agreed with Appellants that the bankruptcy court denied them due process by failing to conduct a trial on remand, the Court would have remanded for a further trial.  This would have largely mooted Appellants' further appellate issues (e.g., their concerns regarding evidentiary sufficiency).  The Court therefore addresses Appellants' due process arguments first.

3.  Whether the trial court erred in apportioning liability among the Defendants as joint and several?

4.  Whether the trial court erred in it's [sic] computation and assessment of damages?

(D. 12 at 8).

## IV.  ANALYSIS

### A.  Due Process

The record makes clear that Appellants and Mr. Dring did everything in their power to compromise the fairness and integrity of the bankruptcy process.[2]   Ironically, Appellants now claim that the bankruptcy court denied them fair procedures (D. 12 at 37).   According to Appellants, they lacked notice of the claims against them and were denied a full and fair opportunity to be heard (*id.*).   The Court disagrees with Appellants.   But even if it did agree, it would find that reversal of the bankruptcy court's order would not be warranted, given that Appellants invited the bankruptcy court's purported errors and (by their own admission) were not prejudiced by the bankruptcy court's procedures.

### 1.  *Appellants were given notice and a meaningful opportunity to be heard.*

Appellants attack the bankruptcy court's failure to hold a new trial (or at least some other type of evidentiary proceeding) on remand (D. 12 at 25, 35–36).   Typically, an appellate court

---

[2] Indeed, when this matter went to trial in 2014, Mr. Dring claimed that he had sold Plaintiff's Kenworth to a mysterious "Mexican national" for $16,000 in cash two days before Plaintiff's bankruptcy filing, and therefore had no truck to return to Plaintiff after Plaintiff's bankruptcy filing (D. 6-1 at 704).   The purported buyer—who was allegedly in such a hurry to take the truck across the border that he did not have time to obtain a title in his own name—evidently left the truck at the WD lot after he purchased it, such that it was still present on the day Plaintiff filed his petition and notified Defendants of the stay (*id.*).   The supposed sale fell within the 10-day cure period Defendants had offered Plaintiff, but when confronted with the notice (which bore his signature) Mr. Dring claimed it had been sent in error without his consent or approval (*id.* at 724).   In support of their narrative, Defendants cited a "bill of sale" that they conveniently located on the eve of trial (but had not referenced in prior pleadings or produced in discovery) bearing handwriting with a striking resemblance to that on documents concededly authored by Mr. Williams (D. 6-2 at 234).   Mr. Williams was also observed during a recess discussing Plaintiff's testimony with a sequestered defense witness and coaching him on what he "need[ed] [] to say" (D. 6-1 at 569).

would review this conduct for abuse of discretion. *See U.S. v. Bell Petroleum Services, Inc.*, 64 F.3d 202, 204 (5th Cir. 1995) ("Where further proceedings are contemplated by an appellate opinion, the district court retains the discretion to admit additional evidence"); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1577 (Fed. Cir. 1991) ("Absent contrary instructions, a remand for reconsideration leaves the precise manner of reconsideration—whether on the existing record or with additional testimony or other evidence—to the sound discretion of the trial court."); *In re Racing Servs., Inc.,* 635 B.R. at 506 ("In the absence of an overt directive, the trial court evaluates whether to reopen the evidentiary record on remand to receive probative evidence that would be logically responsive to the appellate court's analysis."). But Appellants frame the bankruptcy court's decision not to hold further evidentiary proceedings as a due process violation. Due process violations are generally reviewed *de novo, see In re Gledhill*, 76 F.3d at 1083, and Appellants argue that *de novo* review is required here (D. 12 at 9). Plaintiff apparently agrees (D. 13 at 6). Applying the parties' suggested *de novo* standard of review, the Court finds that Appellants were afforded due process.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). But at bottom, all due process requires is notice and a meaningful opportunity to be heard. *Standard Indus., Inc. v. Aquila, Inc. (In re C.W. Mining Co.)*, 625 F.3d 1240, 1244 (10th Cir. 2010); *see also In re Makeen*, No. 1:21-CV-01461-DDD, 2022 WL 824416, at *9 (D. Colo. Mar. 18, 2022) ("Procedural due process simply requires some kind of notice and an opportunity to be heard."). "Although the right to be heard is an integral part of due process, an individual entitled to such process is not entitled to

dictate to the court the precise manner in which he is to be heard." *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 325 (10th Cir. 1984).

Appellants contend that "[t]he matter tried before the trial court consisted only of whether Dring terminated Appellee's rights in the Kenworth prior to the bankruptcy filing, and whether WD and/or Williams terminated Appellee's rights in the Peterbilt prior to the bankruptcy filing" (D. 12 at 35)  The upshot, at least according to Appellants, is that they were deprived of the opportunity to litigate the essential grounds of the bankruptcy court's order on remand:

> The trial court predicated it's [sic] order and judgment on allegations in Appellee's amended complaint (specifically the new allegations contained in paragraphs 65, 90 & 95), which suggested for the first time that title for the Kenworht [sic] was transferred after the Petition Date.  Appellants did not have an opportunity present [sic] or cross-examine testimony or evidence related to those allegations. Furthermore, at no time did Appellee plead the existence of conspiracy between Dring and Appellants or an agency relationship between Dring and Appellants, or that Williams played any role in the transfer of the Kenworth title, and the Appellants had no opportunity to litigate those matters.

(*Id.* at 36).  Effectively, Appellants claim they were denied notice and an opportunity to be heard because the bankruptcy court did not conduct a second trial or evidentiary hearing on remand.

This is a non-sequitur.  The lack of a second trial does not mean that the bankruptcy court's chosen substitute procedure (written closing arguments) deprived Appellants of notice of the claims and theories of liability at issue or the opportunity to litigate these claims and theories.  To the contrary, the record shows that Appellants knew what claims were in issue and had the opportunity to (and did) contest them.

The bankruptcy court advised the parties exactly what its order on remand would address— specifically, Defendants' post-petition conduct, which the court would review through the lens of

11 U.S.C. § 362(k) (D. 6-3 at 4).  Even if the bankruptcy court's advisements could be ignored, Plaintiff's amended complaint—as Appellants concede—also alleged that Defendants violated the automatic bankruptcy stay imposed under 11 U.S.C. § 362 by engaging in affirmative post-petition acts (specifically, re-titling the Kenworth) (*see, e.g.*, D. 6-2 at 115 ("Defendants' transferring title of the [Kenworth] to Mr. Dring's name on August 7, 2013 was a post-petition act to deprive the bankruptcy estate of the [Kenworth] and therefore was a violation of the Automatic Stay Order intended to deprive the bankruptcy estate of an asset.")).  That is why Appellants, in their words, "specifically denied playing any role in the transfer of the title of the Kenworth" (D. 12 at 23).

Appellants also claim that they were not on notice that they might be held jointly responsible for Mr. Dring's actions.  But again, the bankruptcy court highlighted that apportionment was in issue (*see* D. 6-2 at 103).  And while Plaintiff's amended complaint did not use the words "agent" or "agency," it pleaded the facts exemplifying this relationship, and sought to hold Mr. Williams liable for acts he was alleged to have taken on Mr. Dring's behalf.  For instance, it alleged that "Mr. Williams transferred title to the Kenworth from Plaintiff's name to Mr. Dring's name on August 7, 2013," and recounted Mr. Dring's 2014 trial testimony concerning Mr. Williams' role in transferring the Kenworth's title for Mr. Dring (*see id.* at 121).

Appellants lack-of-notice arguments are also belied by the nature of the staggered-briefing procedure the bankruptcy court applied at their suggestion.  Plaintiff filed his closing brief first, giving Appellants the opportunity to address each theory of liability he raised—including those Appellants contend were not pleaded or litigated.  Plaintiff's closing explicitly argued that "Defendants' post-filing sale of the [Kenworth], facilitated by the paperwork drafted and filed by Mr. Williams on Mr. Dring's behalf, divested the estate of the [Kenworth] and in doing so violated

the Automatic Stay Order," and detailed trial testimony concerning Mr. Williams' role in performing Mr. Dring's title work (*id.* at 204–05, 211).  Appellants cannot credibly claim that they lacked notice that the bankruptcy court might find that Mr. Williams was jointly liable for an automatic stay violation because he assisted Mr. Dring with transferring the Kenworth's title.

Appellants also had an opportunity—which they took—to address these issues in their Response to Plaintiff's Closing Argument.  In their written closing, they argued that Plaintiff lacked evidentiary support for his contention that Defendants transferred title to the Kenworth post-petition and that Plaintiffs "attempt to hold Williams and WD liable for the alleged transfer of title into Dring's name after the Petition Date" was not "viable," including because Plaintiff did "not cite to the record for his assertion that Williams assisted Dring in transferring the title after the Petition Date and [] cite[d] no legal theory for the extension of liability to Williams (or WD) for allegedly assisting an alleged transfer of title by Dring" (*id.* at 222).  Clearly, Appellants understood that Plaintiff sought to hold them liable for their roles in transferring the Kenworth's title, and contested Plaintiff's claims.  Though Appellants' Response to Plaintiff's Closing Argument asserts that Appellants did not have notice and an opportunity to be heard on certain of Plaintiff's claims and theories (*id.* at 217), their closing argument was itself an opportunity to be heard.

Appellants cite no cases and make no argument explaining why this opportunity was constitutionally deficient (or, in other words, why alternative procedures were required). Appellants rely instead on *Int'l Union v. Bagwell*, 512 U.S. 821, 832 (1994), which holds that summary adjudication is sometimes inappropriate in contempt proceedings.  But *Bagwell* does not explain why due process requires a bankruptcy court (after previously conducting a trial) to hold

a further trial on remand in a case concerning liability under § 362 of the Bankruptcy Code.  The Court concludes that under the circumstances here—where Appellants did receive a full trial, and the bankruptcy court offered the parties an additional opportunity to brief the evidence from this trial considering changes in applicable law—Appellants were not denied due process.

> 2.  *Even if the bankruptcy court erred, its use of Appellants' chosen procedures does not require reversal.*

"The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was an error."  *John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001); *see also Nitka v. Dep't of Educ. (In re Nitka)*, 857 F. App'x 965, 967 (10th Cir. 2021) ("Although Nikta now contends the court abused its discretion, he made his choice and cannot complain of any invited error.").  That is precisely what Appellants attempt to do here.  Appellants affirmatively asked the bankruptcy court not to conduct further evidentiary proceedings, presumably gambling that the evidence from the 2014 trial would not suffice to support a finding of liability (D. 6-2 at 94).  Appellants cannot shirk the consequences of their strategic choices by complaining that the bankruptcy court—in structuring its proceedings along the lines they suggested—denied them due process.

Appellants attempt to distract from their protests to holding a second trial by accusing the bankruptcy court of misrepresenting the parties' conversation at the February 3, 2021, status conference:

> The trial court's Order on Remand states that the parties agreed that the trial court did not need to reopen evidence.  (R. 2. At 232).  There was no such agreement, and Appellants expressed concerns about the availability of evidence, as well as the imposition of sanctions under theories of liability that had not been pleaded and litigated. (R. 4 1-12).

(D. 12 at 24).  But contrary to their representations, the bankruptcy court did not independently decide to forgo a second trial.  Instead, the entire point of the status hearing was to evaluate—from the parties' perspective—whether a second trial was necessary, or whether it was appropriate to proceed on the evidence from the earlier trial.  Though Appellants raised concerns that potential sanctions for violations of § 542 of the Bankruptcy Code (i.e., sanctions for violations of the bankruptcy court's turnover orders) had not been adequately or previously litigated, Appellants did not object to the court proceeding on the theory that Defendants' post-petition transfer of the Kenworth violated the automatic stay (D. 6-3 at 6–7).[3]  In other words, Appellants did not object to proceeding without a trial on the theory that the bankruptcy court ultimately relied on.  Instead of objecting, Appellants asked for a modification to the bankruptcy court's proposed briefing procedure, which the bankruptcy court agreed to (*id.* at 7–8).

Further, Appellants did agree that a trial would be impracticable, given the length of time that had elapsed since the putative stay violations:

> You know, I have serious concerns about the viability of a trial this far after the fact.  Mr. Dring is dead.  Mr. Williams has been in a very serious car accident that resulted in him having multiple surgeries and memory loss.  Some of the key witnesses are long gone, with whereabouts unknown.  And so, I have serious concerns about the ability to conduct a meaningful trial.

(*Id.* at 6).

These concerns are consistent with Appellants' objections in their Motion to Limit Issues Heard at Trial, which objected to "reopening the record and the consideration of new evidence" on the ground that the adversary proceeding had already gone to trial (D. 6-2 at 94), and their

---

[3] Rather, Appellants asserted that there was insufficient evidence to support their liability on this theory—an argument the bankruptcy court told Appellants they were free to make (D. 6-3 at 6–7).

Response to Plaintiff's Closing Argument, which expressly incorporated their Motion to Limit Issues Heard at Trial (*id.* at 218). The bankruptcy court did exactly what Appellants asked for when it did not hold a new trial and did not reopen evidence. The Court recognizes that some of Appellants' objections may be in tension with others (in a sense, Appellants objected both to having a trial and not having a trial), but the Court gets the distinct impression that had the bankruptcy court conducted a second trial, Appellants would still complain that the bankruptcy court's procedures were unfair. The bankruptcy court had to plot a course, and it ultimately chose one of the ones that Appellants themselves requested. Because the bankruptcy court did what Appellants asked, reversal is not warranted.

      *3.  The bankruptcy court's procedures did not prejudice Appellants.*

It is also apparent from Appellants' own statements that the bankruptcy court's failure to hold a new trial did not prejudice them. Indeed, Appellants told the bankruptcy court that a further trial would have been unfair because key witnesses were dead or unavailable, and Mr. Williams— due to injuries sustained in a car accident—suffers from memory loss (D. 6-3 at 6). On appeal, Appellants flatly claim that they were denied the ability to present evidence or cross examine witnesses when the bankruptcy court decided not to hold a second trial (D. 12 at 36). But this begs the question. What evidence would they have presented? And what witnesses were they unable to cross examine?

If anything, a second trial likely would have allowed Plaintiff to adduce even stronger evidence on the dispositive issues in this case. Plaintiff's counsel—presumably observing his professional obligations of candor to the court and duties under Federal Rule of Bankruptcy Procedure 9011—signed pleadings alleging that Department of Motor Vehicle records show that

title to the Kenworth was transferred from Plaintiff's name to Mr. Dring's name on August 7, 2013—the day after the automatic stay went to effect (*see* D. 6-2 at 112, 122).[4]  This fact, coupled with existing testimony that Mr. Williams assisted Mr. Dring with his title paperwork, would seem to put Plaintiff's claims on even stronger footing.  Further evidentiary proceedings would have allowed Plaintiff to enter the referenced records into evidence.

It also strikes the Court that a new trial would not have allowed Appellants to rebut earlier evidence that Mr. Williams assisted Mr. Dring with his title paperwork.  Obviously, Mr. Williams and Mr. Dring's dealings were fully known only to them, so a new trial likely would not have enabled Appellants to contest Mr. Williams' role in assisting Mr. Dring.  At best, Appellants might have been able to secure the self-serving denials of Mr. Williams (who concededly has suffered memory loss) about actions he took roughly a decade earlier.  Under the circumstances, the Court cannot find that the bankruptcy court prejudiced Appellants by opting not to hold a new trial.  The evident lack of prejudice is fatal to Appellants' due process arguments.  *See In re Fog Cap Retail Invs., LLC*, No. 20-CV-03823-PAB, 2022 WL 3443685, at *11 (D. Colo. Aug. 17, 2022) (rejecting a due process claim where "appellants did not suffer prejudice by virtue of" the purported due process violation).

## B.  Evidentiary Sufficiency

Appellants broadly claim that "[t]he evidence before the trial court was insufficient to support the findings in the November 4, 2021 order [on remand]" (D. 12 at 26–27).  It would have assisted the Court if Appellants had specified precisely what findings it believed were unsupported

---

[4] Per Rule 9011, "[b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a [] pleading . . . an attorney . . . is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support . . . ."

up front.  But from reviewing Appellants' brief, the Court understands that Appellants are arguing that "no evidence . . .was presented that would tend to show the Kenworth was sold or transferred while the automatic stay was active" and may be attacking the bankruptcy court's finding that Mr. Williams assisted Mr. Dring with his title work (*id.* at 27, 29).

After reviewing the record, the Court concludes that the bankruptcy court's findings that Mr. Dring transferred the Kenworth (and/or title thereto) when the automatic stay was in effect and with Mr. Williams' assistance have factual support.  Accordingly, they are not clearly erroneous.[5]  Appellants ignore trial testimony that the Kenworth mysteriously disappeared from WD's yard the day after Plaintiff filed for bankruptcy (and after Defendants had notice of Plaintiff's filing) (D. 6-1 at 562).  The bankruptcy court (for reasons Appellants do not dispute) rejected Defendants' narrative that they had sold the Kenworth to a Mexican national for cash a mere two days before Plaintiff's bankruptcy filing.  Instead, the bankruptcy court logically deduced that Defendants—after learning of Plaintiff's bankruptcy—immediately disposed of the truck in a deliberate attempt to circumvent the automatic stay.  While Plaintiff's claim might benefit from additional evidence (e.g., DMV records reflecting a title transfer),[6] the court cannot say that it was clearly erroneous for the bankruptcy court to conclude (based on Defendants' lack of credibility and the timing of the Kenworth's disappearance) that Defendants transferred the Kenworth (and transferred title to the Kenworth to facilitate a sale) while the stay was in effect.

---

[5] Appellants, (mis)citing and misapplying an unpublished habeas case, contend that the Court should review the bankruptcy court's factual findings *de novo* (*see* D. 12 at 26 (attempting to cite *Look v. Hargett*, 107 F.3d 21 (10th Cir. 1993))).  The Court declines this invitation.

[6] To be clear, the bankruptcy court's order on remand does not reference or purport to rely on DMV records, which were referenced in Plaintiff's amended pleadings but did not apparently enter the evidentiary record.  To the extent Appellants argue that the bankruptcy court improperly premised its order on evidence that was not before it, the Court rejects this contention.

Appellants also misrepresent Mr. Dring's trial testimony concerning title assistance he received from Mr. Williams.  They claim that "[a] review of the trial transcript shows that Dring testified that Williams may have occasionally served as a scrivener for Dring, although that testimony was related to a small claims suit and not the title of the Kenworth" (D. 12 at 29).  But in fact, when asked if anyone filled out the "repossession paperwork on the 2006 Kenworth to take to the DMV after it was repossessed" Mr. Dring testified that "Mr. Williams did" (D. 6-1 at 737). Mr. Dring further testified that Mr. Williams generally did his title work because Mr. Dring was "not familiar with it" (*id.* at 740).  Based on Mr. Dring's testimony that Mr. Williams assisted him with DMV and title paperwork, it was not clear error for the bankruptcy court to find that is exactly what happened with the Kenworth.  Because the factual record supports the bankruptcy court's challenged findings, the Court concludes that reversal is not required.

### C.  Liability Apportionment

The Court finds, on a *de novo* review, that the bankruptcy court did not err in concluding that joint and several liability is available for damages imposed under 11 U.S.C. § 362(k). Appellants assert that "joint and several liability is generally dispreferred in stay violation cases" and "Colorado law has abolished joint and several liability in tort actions," so the bankruptcy court "committed reversable error by imposing joint and several liability without considering the relative fault of the parties" (D. 12 at 33–34).

Neither of these arguments require the Court to find that the bankruptcy court erred.  First, courts routinely apply joint and several liability to damages awards under 11 U.S.C. § 362(k)—a fact Appellants ignore.  *See, e.g.*, *In re Webb*, 2012 WL 2329051, at *7 n.4 (B.A.P. 6th Cir. 2012) (collecting cases); *Hamby v. Fouts (In re Hamby)*, 646 B.R. 865, 878 (Bankr. N.D. Ga. 2022)

(imposing joint and several liability against a principal of secured creditors that violated the automatic stay); *In re Kutumian*, No. 13-14675-B-7, 2014 WL 2024789, at *12 (Bankr. E.D. Cal. May 15, 2014) ("The Debtor will be awarded his actual damages . . . .  The damages award shall be joint and several . . . ."); *In re Stefani*, No. BR 18-00395-LT13, 2019 WL 762661, at *1 (Bankr. S.D. Cal. Feb. 15, 2019) ("The Court has now concluded its final review of the facts relevant to this case and the law related to punitive damages under § 362(k)(1) and concludes that an award of punitive damages in the amount of $17,000.00 is appropriate.  The award will be joint and several . . . .").

Second, Appellants make no effort to explain why Colorado's state-law limitations on joint and several liability apply to claims for damages under 11 U.S.C. § 362(k).  Appellants cite Colorado Revised Statutes § 13-21-111.5, which generally prohibits defendants in actions "brought as a result of a death or an injury to person or property" from being held liable for amounts not proportional to their degrees of negligence or fault.  However, they cite no cases applying this statute in the context of damages awards imposed under the Bankruptcy Code, and do not otherwise argue why § 13-21-111.5 can be reconciled with the Bankruptcy Code's remedial scheme.

The damages limitations enumerated in § 13-21-111.5 do not always (or even generally) apply to federal claims.  *See Fourhorn v. City & Cnty. of Denver*, No. 08-cv-01693-MSK-KLM, 2008 WL 5423349, at *3 (D. Colo. Dec. 30, 2008) ("Section 13–21–111.5 is not applicable to diminish a parties' liability for federal law claims.").  And because Appellants did not make a coherent, developed argument for applying § 13-21-111.5 here, the Court declines to do so.  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such

'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'" (quoting *Murrell v. Shalala*, 43 F.3d 1388, 1390 n. 2 (10th Cir. 1994)); *see also Roe v. Hous. Auth. of City of Boulder*, 909 F. Supp. 814, 823 (D. Colo. 1995) (declining to apply Colorado's comparative fault statute, where, as here, the party seeking to invoke it failed to cite any authority applying the statute to the federal claims at issue).

Appellants also may be arguing that reversal is required because the bankruptcy court originally apportioned some damages among Defendants, but has now held that Appellants are jointly and severally liable for all awarded damages:

> Also of concern is that the trial court, after receiving all of the evidence in the 2014 trial, found that certain harm was caused entirely by Dring, and imposed $35,295.08 in actual damages, and another $35,295.08 in punitive damages, against Dring alone. Despite receiving no additional evidence, the trial court now holds Dring and Williams jointly and severally liabile [sic] for all damages, including those damages that were previsouly [sic] awarded against only Dring.

(D. 12 at 34).  The Court is unsure whether Appellants view these facts as an independent basis for reversal.  Again, this is not a coherent argument supported by legal authority and argument. And again, the Court will not reverse on the basis of Appellants' half-formed thought.  *See Wooten*, 377 F.3d at 1145.  Additionally, the change in how damages were allocated was a logical consequence of changes in the underlying theories of liability.  While the damages *figure* in the bankruptcy court's order on remand mirrors the figure originally imposed, the *theory* supporting damages is different.  Originally, the bankruptcy court awarded some damages against Mr. Dring alone because Mr. Dring did not turn the Kenworth over to Plaintiff after the stay went into effect. Now, the basis for the bankruptcy court's damages award is that Mr. Dring—*with Mr. Williams' assistance*—transferred title to the Kenworth after the stay went into effect.  In light of the changes

in the legal theory supporting damages, the Court does not find that the bankruptcy court erred in imposing joint and several liability on Mr. Williams for stay violations related to the Kenworth.

### D.  Punitive Damages

Per 11 U.S.C. § 362(k)(1), "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  "Willfulness" for purposes of § 362(k)(1) simply requires "volitational and deliberate" conduct; it does not require specific intent to violate the automatic stay.  *Diviney v. NationsBank of Texas, N.A. (In re Diviney)*, 225 B.R. 762, 774 (B.A.P. 10th Cir. 1998).  When considering whether punitive damages are properly imposed for a willful stay violation, a court must determine whether "the defendant acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so."  *In re Gagliardi*, 290 B.R. 808, 820 (Bankr. D. Colo. 2003).  The Bankruptcy Appellate Panel for the Tenth Circuit has also articulated a four-factor test informing when punitive damages are appropriately awarded.  *In re Diviney*, 225 B.R. at 777.  These factors include: "(1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the motives of the defendant; and (4) any provocation by the debtor."  *Id.*  Colorado bankruptcy courts also consider a fifth factor: "the level of sophistication of the creditor."  *See In re Gagliardi*, 290 B.R. at 820.

Appellants complain that the bankruptcy court made several errors when it awarded punitive damages.  Appellants' arguments are largely recycled from their last appeal to the District Court, and this Court rejects them for much the same reasons that Judge Blackburn did.  *See Cowen v. WD Equipment, LLC (In re Cowen)*, 549 B.R. 774, 785–89 (D. Colo. 2015).

First, Appellants claim that the bankruptcy court "received no evidence regarding Appellants' 'actual knowledge' or 'reckless disregard'" of the automatic stay, such that there is no evidence that they willfully violated it (D. 12 at 40). The record flatly contradicts this argument. Indeed, Appellants never claimed that they lacked prompt notice of Plaintiff's bankruptcy filing. Rather, Mr. Williams acknowledged that he had notice of Plaintiff's bankruptcy on August 6, 2013 (D. 6-1 at 625). And Mr. Dring (whom Mr. Williams assisted) also specifically testified that he had received notice of the automatic stay that day (*id.* at 757). The Court concludes that the bankruptcy court had adequate factual support to find that "Mr. Dring and Mr. Williams received notice of the bankruptcy filing and a request for the immediate return of both Trucks . . . on August 6th" (D. 6-2 at 235).

Second, Appellants contend that the bankruptcy court erred in applying the *Diviney/Gagliardi* factors to decide the *amount* of punitive damages to award, and not *whether* punitive damages ought to be awarded. Transparently, the bankruptcy court did consider these factors in deciding whether to award punitive damages (*see* D. 6-2 at 251 ("[T]he remaining factors weigh heavily in favor of the *imposition* of punitive damages here" (emphasis added))). And while the bankruptcy court also considered these factors (as well as what amount would properly serve the purposes of punishment and deterrence) in conjunction with the magnitude of the award, that is not legal error: as is apparent from *Gagliardi* itself, there is considerable overlap between the factors courts apply when determining whether to impose punitive damages and the quantum of punitive damages to impose. *In re Gagliardi*, 290 B.R. at 822 (considering, among other factors, "the nature of the [defendants'] conduct" and the defendants' ability to pay when deciding the amount of a punitive damages award). As Judge Blackburn observed the last time that Appellants

29

made this argument before the District Court, "the two groups of factors [for deciding whether to impose punitive damages and for determining the amount of punitive damages to impose] are quite similar and bleed together.  The consideration of the *Diviney/Gagliardi* factors on the question of the amount of punitive damages was not error."  *In re Cowen*, 549 B.R. at 786.

Third, Appellants assert that the bankruptcy court failed to properly consider the individual *Diviney/Gagliardi* factors.  The Court disagrees.  The bankruptcy court's order addresses each factor:

> The Court finds that an award of punitive damages equal to the amount of the actual damages is warranted in this case.  Although the Court received no evidence regarding any of the Defendants' ability to pay damages, the remaining factors weigh heavily in favor of the imposition of punitive damages here.  Mr. Dring's and Mr. Williams' conduct involves the most egregious stay violations this Court has ever seen.  While the Debtor clearly defaulted on his loan obligations, nothing he did justified the scorched earth tactics employed by the Defendants.  The Court found Mr. Dring's and Mr. Williams' attitudes while testifying to be contemptuous of the bankruptcy process, the Debtor, and the Court.  And while Mr. Dring and Mr. Williams may not be sophisticated in the sense of running a Fortune 500 company, they are extremely scheming and manipulative.

(D. 6-2 at 251).

The bankruptcy court went on to discuss Mr. Dring's and Mr. Williams' problematic conduct in these proceedings:

> In their attempts to avoid liability for their actions, Mr. Dring and Mr. Williams likely forged documents and gave perjured testimony.  Certainly, they changed their stories over the course of this case on both major and insignificant issues.  The documents they produced to attempt to convince the Court that the Debtor's rights in the Kenworth had been terminated pre-bankruptcy were highly suspect to say the least.  And it came to light during the trial that they coached their witnesses on what to testify to during the breaks, despite a sequestration order to the contrary.  Braden Cowen, the

> Debtor's thirteen-year-old son, testified to seeing Mr. Williams walk up to Butch Dring, a sequestered witness, during a break in the trial and overheard him say something to the effect of "this is what [the Debtor] just said. Here's what I need you to say."

(*Id.* at 251–52).

Appellants argue that it was error for the bankruptcy court to enter an award of punitive damages without taking evidence of Appellants' ability to pay (D. 12 at 41). But a finding on Appellants' ability to pay was not a basis for the bankruptcy court's award, and the bankruptcy court noted that—while it had not taken evidence on the "ability to pay" factor—the other factors militated strongly in favor of a punitive damages award (such that even if the bankruptcy court had received evidence that Appellants had limited financial resources, a punitive damages award would have been warranted anyway) (D. 6-2. at 251). Appellants cite no case, and make no legal argument, suggesting that a bankruptcy court cannot impose punitive damages after concluding that the "ability to pay" factor weighs against punitive damages, but the other four factors weigh in favor of punitive damages. Instead, Appellants argue that bankruptcy court erred in its conclusions on the other four factors (D. 12 at 41).

Regarding the "provocation" factor, Appellants contend that the bankruptcy court improperly failed to account for the role of Plaintiff's default in provoking Defendants' repossession of the Kenworth (*id.*). This argument misses the mark, because the "provocation" analysis focuses on whether a debtor provoked the creditor's automatic stay violations, and not necessarily whether the debtor provoked repossession of the relevant collateral. *See Tigue v. Steger (In re Tigue)*, 82 B.R.724, 737 n.3 (Bankr. E.D. Pa. 1988) (noting that a "keynote" of the punitive damages analysis is the provocation or want of provocation for the wrongful act); *In re Stephens*, 495 B.R. 608, 615 (Bankr. N.D. Ga. 2013) (focusing on provocation, in connection with

the stay violations, when assessing punitive damages); *In re Witham*, 579 B.R. 787, 796 (Bankr. E.D. Ky. 2017) (same).  Accordingly, the relevant question here is whether Plaintiff did anything to provoke Defendants' post-petition transfer of the Kenworth, rather than its pre-petition repossession.  While Plaintiff's default provoked the pre-petition repossession, it did not, as the bankruptcy court correctly concluded, justify Defendants' post-petition transfer.  Accordingly, the bankruptcy court did not err in concluding that the provocation factor weighed in favor of punitive damages even in the face of Plaintiff's default.

Appellants further assert that the bankruptcy court misapplied the "defendant's conduct" and "motivation" factors because its analysis focuses on Appellants' conduct at trial, rather than their conduct and motivations in violating the automatic stay (D. 12 at 42).  But Appellants' misconduct during the trial speaks to both of these issues because it shows their acute disregard for the bankruptcy process.  Because Appellants proved themselves to be bad actors by the way they conducted themselves at trial, it was not unreasonable for the bankruptcy court to conclude that Appellants conducted themselves as bad actors when they violated the automatic stay and were motivated by improper considerations when they did so.

Additionally, Appellants argue that the bankruptcy court erred when it concluded that the sophistication factor weighed in favor of punitive damages, because Appellants' trial conduct (e.g., forging documents, committing perjury, and coaching witnesses) speaks to a marked lack of sophistication (*id.* at 43).  But again, it is Appellants, rather than the bankruptcy court, who misconstrue the test.  The "sophistication" factor does not turn on whether a creditor acts prudently—it depends on a creditor's ability to understand the stay and the nature of the conduct prohibited.  *See In re Baggs*, 283 B.R. 726, 729 (Bankr. C.D. Ill. 2002) (observing that the

defendant—an automobile dealership—had the requisite level of sophistication to understand the effect of the automatic stay). By manufacturing evidence tending to disprove a stay violation, Appellants showed that they understood the nature of the stay and what acts would create liability under the stay. Accordingly, the Court concludes that the bankruptcy court did not incorrectly apply this factor.

Fourth and finally, Appellants argue that the punitive damages award is constitutionally excessive. In support of this contention, they cite *Diviney* and *Gagliardi*, which respectively validated and imposed punitive damages awards of 2.25- and 2.53-times actual damages. *See In re Diviney*, 225 B.R. at 777; *In re Gagliardi*, 290 B.R. at 822. Here, the bankruptcy court awarded punitive damages in a 1:1 ratio with actual damages (D. 6-2 at 252). The Court fails to see how *Diviney* and *Gagliardi* mandate a different result or stand for the proposition that the bankruptcy court's award was somehow excessive. Rather, the punitive damages award in this case is reasonable, measured, and appropriately imposed in response to the stay violation the bankruptcy court identified and in view of the need to deter the conduct Defendants engaged in.

## V. CONCLUSION

Based on the foregoing, the bankruptcy court's November 4, 2021, Order on Remand is **AFFIRMED.** It is FURTHER ORDERED that Plaintiff Jared Cowen is entitled to damages as specified in the bankruptcy court's November 4, 2021, Order on Remand.

DATED November 8, 2023.

BY THE COURT:

Gordon P. Gallagher
United States District Judge